v. Demetri Kolesnikov, defendant-appellant, arguing for the appellant, Stephen L. Walker, arguing for the appellee, David Friedland. Good morning, counsel, and we do apologize for being a bit late, but we had another argument that extended beyond our time, but we will give you your time, even if it extends beyond the clock time. So, Mr. Walker, when you are ready, you may proceed. Thank you. Good morning, your honors and counsel. May it please the court. My name is Stephen Walker, defendant-appellant, Demetri Kolesnikov, on behalf of the Office of the State Appellate Defender. Your honors, Mr. Kolesnikov asked that this court reverse the trial court's denial of his motion to suppress and vacate his convictions, as the state cannot possibly prove its case if the improperly seized evidence is suppressed. The facts require this result. On June 27, 2017, at about 8 a.m., officers Berryhill and Foy received a dispatch regarding a 911 call placed by a man's ex-girlfriend, indicating that the man had told her that he intended to commit suicide. When the officers arrived, they knew that the man threatening to commit suicide was Mr. Kolesnikov. When they approached the door, Mr. Kolesnikov, wearing a bathrobe, answered, and the officers identified him based on the driver's license image they had received from dispatch. They also noticed that Mr. Kolesnikov appeared dry, intoxicated, slow, sluggish, groggy, and, to quote one of the officers, very evasive, as he did not give them a lot of information. However, he was also calm and courteous to the officers. Kolesnikov told the officers that they could not enter his home and asked him why they were there. The officers told him that they wanted to ask him a few things, and he came out of his house and stood on the porch with them. Kolesnikov told the officers that the 911 caller was, in fact, his ex-girlfriend, but he appeared confused when they asked him if he sent any emails to her. The officers asked Kolesnikov if he had been drinking the night before, and he told them yes, and that he had just woken up. While speaking with Kolesnikov, Officer Foy received an image from dispatch that Kolesnikov's ex-girlfriend had sent. The image depicted a man wearing jeans and sitting down in a bathtub with a large knife on his lap. The officers asked Kolesnikov if he sent the image, but Kolesnikov did not answer and merely appeared confused. At that time, the officers decided to take Mr. Kolesnikov over to an ambulance, a nearby ambulance, for an evaluation, and when paramedics pushed up Kolesnikov's robe sleeves, the officers saw that he had superficial cut marks on one of his arms. The officers asked Kolesnikov if anyone else was in the house, and Kolesnikov told them no. Based on Kolesnikov's previously so-called evasive responses, when asked about the photo of the man in the tub, Foy and Berryhill nevertheless went back to the house and entered. However, Officer Foy admitted that she did not believe there was any emergency once Kolesnikov was in the ambulance. Therefore, at the time the officers sought to warrantlessly search or enter Kolesnikov's home, they were clearly acting in contravention to the Fourth Amendment warrant requirement. Below, the state argued that the community caretaking exception applied, and the trial court agreed, but as outlined in Kolesnikov's opening brief, the community based on bald, abstract concern. Officers must be able to point to some objective basis for believing that their assistance is required. In both People v. Lomax and People v. Hand, police were told by a third party that there were children within the home that needed assistance. In this case, Kolesnikov stands in place or is analogous to the child or children needing assistance in those cases, as his ex-girlfriend identified only him as the individual threatening to commit suicide and needing assistance. Kolesnikov also told officers that no one else was in the home. The officers clearly saw Kolesnikov wearing a bathrobe, which would have indicated that he was more than likely the man in the bathtub, and he had the cut marks on his arms. Thus, this court's holding in People v. Mikrut clearly applies to these facts, and the officers improperly expanded their intrusion beyond the strictly circumscribed exigencies justifying the initial intrusion. On appeal, the state also attempts to argue that the officers entered Kolesnikov's home in order to search for the intoxicating substance he consumed, apparently in order to conduct some form of detox. But alcohol intoxication or run-of-the-mill hangover does not require that police discover exactly what type of alcohol the individual consumed in order to treat him. In fact, such a standard would be absurd, as the particular brand or type of alcohol consumed is patently immaterial to treatment. Put another way, the overconsumption of beer or hard liquor is known to be treated the same way. Consequently, this argument also fails. Finally, the state argues that exigent circumstances existed at the time police searched Kolesnikov's home based on the apprehension that some other person in the home may have needed assistance or emergency assistance. However, the state fails to point to any objective fact supporting its assertion of exigency. Instead, like the officers, the state imagines that there might have been an individual within the home based on Kolesnikov's inability to identify himself as the man who sent the picture to his ex-girlfriend. Yet, Kolesnikov's ex-girlfriend must have identified the sender of the photo as Kolesnikov as dispatch continued to relay information to the officers about Kolesnikov and Kolesnikov alone. At no point did anyone indicate that someone else may have been inside the home, and officers Berryhill and Foy never asked the third party to verify Kolesnikov's claim that no one else was inside the house. Therefore, the totality of the circumstances known to the officers at the time they entered cannot support a finding that they objectively believed that Officer Foy even admitted at the suppression hearing. The trial court further erred when it held that the improper search was saved by the Plain View Doctrine, as the Plain View Doctrine required that the officers be lawfully within Kolesnikov's home when they found the incriminating evidence. Moreover, if the Plain View Doctrine did apply, the officers did not even need a warrant to seize the evidence. Instead, the officers evidenced that they acted in bad faith when they scuttled back and applied for a warrant. Clearly, they understood that they were not lawfully within Kolesnikov's home and needed a warrant to conduct a further search. This argument is also buttressed by the fact that binding precedent existed at the time which strictly circumscribed and invalidated the officers' actions, and they were charged with knowing the law at that time. On appeal, the state argues that the subsequent search and seizure based on the warrant the other officers later obtained based on the information received from Officers Berryhill and Foy can save this case, but it cannot. Detective Adam Boyd applied for the warrant in question using only the information he obtained from the officers who illegally entered Mr. Kolesnikov's home. As held by both the United States Supreme Court and the Illinois Supreme Court, a warrant is void and its subsequent execution is conducted in bad faith when the basis for the warrant's issuance is premised entirely upon information obtained from an illegal search. Moreover, to hold otherwise would serve to enable police to sidestep the law by having one group of officers conduct an illegal search and then allowing another group of cordoned and intentionally ignorant officers execute a search warrant based on that illegally obtained information. In short, the result would be abolishing the Fourth Amendment with a few extra steps. Because such a result is untenable, the state's argument again necessarily fails. Thus, in conclusion, the officers in this case clearly acted in contravention to the Fourth Amendment warrant requirement and any subsequent search within Kolesnikov's home could not have been conducted in good faith. Therefore, Mr. Kolesnikov respectfully requests that this court reverse the trial court's order denying his motion to suppress and vacate his convictions. Thank you. Justice Jorgensen, do you have any questions? I do. Did the defendant go to the ambulance voluntarily? Yes, the defendant did go to the ambulance voluntarily. All right, so then the police have some obligation to secure his home, correct? Securing his home would not have required going down into the basement. If anything, they could have walked in, locked the door, and then stepped immediately back out. What about checking for, you know, the stove left on, water running, particularly since we have some indication of water in a bathtub? To allow the police to basically walk throughout someone's home to check on a stove or to check on what they believe to be running water or what have you is enabling them to act on mere suspicion. They don't know that the stove is on. They don't know. They're... Let me ask you this. So you would say in the absence of some objective thing, like the guy comes to the door with a cookie in his hand or something, but would they have an obligation to ensure that the back door is locked? I would say no. If Mr. Kolesnikov, who was sleeping at the time and had just woken up, had left his back door open, that's his business. That's his home. That's his property. And the Fourth Amendment clearly indicates that police do not have carte blanche to do whatever they want within someone's home, even if it may be to the person's benefit. Was there any follow-up with the ex-girlfriend to find out how she knew this or any verification of her story? No. I believe that dispatch was the only body to receive any information from his ex-girlfriend. I would argue that Officers Foy and Berryhill kind of abdicated their duty by not attempting to contact her to verify whether anybody else was in the home or if there may have been some need to go inside the house. I mean, there were ways that the officers could have obtained information before illegally entering Mr. Kolesnikov's home. They could have spoken to his neighbors. They could have reached out to his ex-girlfriend. There were any number of ways. They could have formed a basis to enter his home, but they did not. How far does community caretaking go? I believe as this court has held, community caretaking is strictly circumscribed or limited by the emergency or the need that initially presents itself. As in People v. McRoot, the police didn't need to go into the defendant's bedroom to help the young woman collect her belongings. There was no clear and apparent danger. So just like in McRoot, in this case, there was no evidence. The police didn't say they smelled gas, for instance, going to the stove example. They didn't hear running water. There was nothing to evidence that there was some other emergency situation going on. Let me ask you this then. If the police had left, just pulled the front door closed and taken the defendant and left, and later a person is found in the house injured, hurt, etc., wouldn't the police be responsible for having not fulfilled their caretaking obligations? No, because the police in this case would have had no idea that prescient or omniscient. They can act based only on the objective evidence before them. Again, they could also investigate. Again, they could have called Kolesnikov's ex-girlfriend. They could have spoken to neighbors. They could have asked, does anybody else reside at that address? They could have looked up this information to see if somebody other than Kolesnikov lived in the home. They didn't. They just entered the home. Okay. I have no other questions. Thank you. Justice Hudson, do you have any questions? Yes, I do. Good morning, Mr. Walker. Mr. Walker, the trial court relied on the community caretaking function to find that the warrantless entry was justified. That has two doctrines, as you know. The first part of the doctrine, the first element is the officer's actions must involve some function other than investigation of a crime. Would you acknowledge that they went there pursuant to a 911 call for an emergency? They did not go there to conduct an investigation. Would you agree with that? Yes. When they initially arrived, they did not go there to conduct an investigation. Okay. The second element of the community caretaking doctrine has to be where the search or seizure is reasonable. Okay. Did the police have some articulable basis for conducting the search? In this case, as you alluded to, the identity of the person who was in the email was not certain when they got there. The defendant was somewhat evasive. The individual in the photograph, as I recall, was wearing jeans and was wet. Here, the defendant was dry. He's wearing a bathrobe. The police then, having the basis for believing perhaps somebody else was still in the house who was not the person in the email, went into the house to conduct the search. Don't they have a reason to believe that perhaps someone may still be in there other than the defendant? I believe that the officers did their best to explain their illegal entry, but if you look at evidence as a whole, first of all, Mr. Kolesnikov was either drunk or hungover, which would explain why he was apparently evasive. Maybe he wasn't even evasive. I mean, it's probably quite likely that he was just in a stupor and didn't quite recall what he did the night before. Second, regarding the bathtub and the bathwater, I mean, Mr. Kolesnikov answered the door in a bathrobe, and it's apparent that he was asleep, which means he probably dried himself off and went to bed. There's no objective basis to indicate that. In fact, the evidence objectively indicates that the person in the tub was Mr. Kolesnikov because his ex-girlfriend was only reporting things that he had apparently sent her. So, I would argue- No, she was originally evasive. I mean, his answers were not definitive. They did not discount the fact that somebody else could have been in the house in distress or in need of help. And if we look to the reasonableness or the scope of the search, I think the evidence disclosed that when the police went into the house ostensibly to look for someone else to see if anyone else was in there in distress, the evidence established they did not go through drawers and cabinets, looked under beds and things like that. They only went room to room looking for someone. Is that correct? That would be partially correct, Your Honor. What they did, which to me smacks of an investigation, is go to his kitchen and then down into a basement. Now, while some people may have checked either the ground level or the upstairs. So, to me, that would indicate that the officers were, in fact, conducting some sort of search because, as later found out, Mr. Kolesnikov's co-defendant was found upstairs. So, it's likely that if they had called out, he may have responded or they would have heard him moving around upstairs. Well, but if they called out and the person was injured or unconscious or in distress, they wouldn't have responded. An injured person could have staggered out of the upstairs bathtub and then gone downstairs and fallen. So, I mean, you've pointed out other theories to support your argument, but the question is looking at this through the lens of the officers who went there, was their conduct reasonable? And as you've acknowledged, they didn't look in drawers or closets. They did not look into cabinets where they were conducting clearly an investigatory search for evidence. All of the things they did seemingly would be consistent with looking for a person somewhere in the house. Your Honor, I believe you outlined that the second step in evaluating whether or not the officers are conducting community caretaking function is, are there reasonable, articulable facts that would point to the fact that somebody else would need their assistance? And in this whether or not somebody was in the home is immaterial because there was no objective basis for the officers to believe this. Mr. Kolesnikoff told them that no one else was in the home. Mr. Kolesnikoff was wearing a bathrobe, which means that he was probably the guy in the tub. And if you look at the image, there's the shallow cut mark on the individual in the picture's arm, just as there are shallow cut mark, just as the officers testified that they saw marks on Kolesnikoff's arm. Well, you could argue that there's some facts that would, you know, work against the idea that he, there was somebody else in the house. I don't know. Is there anything explaining what happened to the knife? And would you acknowledge that the picture itself, the police couldn't tell from looking at the picture, whether that person was definitively Kolesnikoff or not? Could they just by looking at the picture? The fact that they received the picture from Kolesnikoff's ex-girlfriend who called specifically and never mentioned anybody else about Kolesnikoff would lead to the conclusion that if she's reporting all this information about Kolesnikoff, it must be Kolesnikoff. Now the officers could have conducted a further investigation at that time. They could have reached out to his girlfriend or talked to neighbors to see if anybody else was in the home, but instead they merely walked into this man's house without a warrant after he told them they couldn't enter. Now I'm not saying that the officers couldn't have done additional investigation and then entered his home to, if somebody relayed information that someone else was in the house or that someone else lived there, but at the time they entered, they didn't have any basis for believing that someone else was in the home. All the evidence in fact pointed to the contrary. Other than the fact that as pointed out, he was wearing a bathrobe, he was not wet, the knife was apparently unrecovered, and they don't know if there was somebody else upstairs because they're relying on someone who you've acknowledged apparently was intoxicated. But let's go a step further. If you want to allege that this was some kind of a phishing expedition for evidence, the fact that they didn't go through the cabinets, they didn't go through drawers, isn't that consistent with their isn't that consistent with that testimony? Your honor, I think going through cabinets and going through drawers is limiting to what kind of like police performing some kind of investigation. Going into somebody's basement, going down into their basement and going checking through doors is the exact same thing as going through somebody's cabinet. All right, let me ask you this. When the police discovered the cannabis plants initially, they opened the door and saw the plants, correct? Correct. Okay, so the plants were in plain view, correct? Yes, but plain view only applies when the officers are lawfully in the place that they're viewing the incriminating evidence. And I think that is true. I just wanted to clarify that they didn't uncover anything, any evidence of cannabis possession in drawers or cabinets again. But let case, it was clear, and make read at least that the officer's purpose had been accomplished when the defendant was secured in the room there. The case law clearly indicated the police had accomplished their community caretaking purpose at that point. Here, that's not the same situation here, is it? Your honor, I do believe it's analogous. Because in this case, the police were called to Kolesnikov's home in order to see if he needed any emergency aid. They identified Kolesnikov. The 911 caller's ex-girlfriend only identified Kolesnikov as the individual needing assistance. And Kolesnikov had been secured in the ambulance before they entered the home. All right, thank you, Mr. Walker. That's all I have at this time. Thank you. All right. This is Justice Hutchinson and Mr. Walker. I believe you have, in fact, agreed that there was no knife found on or about Mr. Kolesnikov. I'm going to call him Mr. K. Mr. K is a person when he answered the door or when he went into the ambulance. Is that correct? That would be correct. But looking at the evidence as a whole, Mr. Kolesnikov went to sleep. It would seem unreasonable to expect that he would be walking around carrying a knife throughout his home. Well, do we have a precise time when the ex-girlfriend thought that this mayhem was going to occur? Was it before he went to sleep or was it after he woke up? Did she say when? We don't actually have the email, do we? No, the email was not introduced. Okay. What we have is a picture that was sent with the email that does not identify the face of the person with the knife, correct? That would be correct, yes. All right. So somewhere we may have a knife in that house. And if this is a community caretaking activity, why can they not look for that particular weapon? Your Honor, I would actually ask why the so-called weapon is significant here. This isn't a case where Mr. Kolesnikov could have done more harm to himself. He was already secured in an ambulance. The knife was his personal property in his home, and he had not brandished it against anybody else prior to the police coming to check on him. Well, once again, how do we know that? How do we know that he had not used it against someone else? There was no evidence indicating that he had used it against somebody else. All the evidence indicates that Mr. Kolesnikov used it on himself. He had the bloody wrist. His ex-girlfriend was conveying information about him. She never said that the email was sent by somebody else. The officers never testified that the email may have been sent by someone else. All this information seems to be coming from Mr. Kolesnikov. All right. Now, in terms of some history, do you have any idea why we now allow police inventory of vehicles after a traffic stop and before the vehicle is taken to a tow lot without the defendant being present? Do you know why we do that? Off the top of my head, Your Honor, I cannot say. Well, after being here for a few years, I think I might know. There were disputes about what was in that car when it was taken. Was it a $100 radio? Was it a $1,000 radio? Was there stuff that inventory? Because there was no record of what was in that car, litigation ensued where there were suits against police departments for the theft or whatever of the materials that were alleged to be inside. If we now have a legitimate police procedure to inventory that can be that releases or that resolves that particular problem of who took what from whom. There is no specific, to my knowledge, similar protocol that is on all of the books of police departments about securing houses. But this officer testified that he was familiar with condominium properties because he had been in others. He knew the general layout of the properties. Maybe he knew there was a door downstairs that needed to be secured. And the fact that the defendant doesn't care if he is pilfered while he's present, don't you think he would be concerned if he was pilfered when he was taken away even voluntarily by an ambulance and nobody protected his stuff? Your Honor, perhaps, but I believe that there would have been less intrusive ways of going about securing the home. Again, these officers didn't ask Mr. Kolesnikov for his keys to lock the door. Like where could the keys be located? In fact, they didn't ask him even if he cared, for instance. Maybe Mr. Kolesnikov, for instance, would have signed off on a waiver stating, no, I just don't want you to go in my house. You can just leave the door where it is, et cetera. And then that would have been on Mr. Kolesnikov. There were other less intrusive ways, other ways that would not have violated the Fourth Amendment. Even though Mr. Kolesnikov is clearly ambiguous under the influence of alcohol and at a minimum not being very helpful generally. That's okay. You can ask him that. And if he says, hey, burn it down, they can go ahead and burn it down. Your honors, I believe that there would be a cutoff at the point of absurdity. If Mr. Kolesnikov told them to burn down his house, clearly they could disregard that. There was nothing stopping them, for instance, from just asking him where his keys were located so that they could lock up the house. They didn't go search his bedroom first. They went down into his basement. If he says my keys are in the house, I'll go get them. Are they going to let him go in there by himself? Of course they could have. No, they are not. They are investigating a person who is allegedly expressed an interest in taking his own life. Why would they let him go back into the alone? They could have escorted Mr. Kolesnikov. One of the officers could have escorted him. But again, the problem here is that they went to the basement of all places. They went to the basement first. They didn't check the upstairs. They didn't really check the living room or dining. The officers were familiar with this location. They knew there was no bathtub in the basement. The knife could have been placed there. But again, the knife was Mr. Kolesnikov's property. Once he was secured in the ambulance and once he received treatment at the hospital or mental health center, he was free to own that knife. The knife, if anything, was an offense he committed against himself. It's his property. All right. I guess I don't have any other questions at this time. All right. Mr. Friedland, if you wish to proceed, you may do so. Thank you, Your Honor. My name is David Friedland and I represent the people of the state of Illinois, Eppley. May it please the court. Initially, I begin by noting that in my brief, I set forth numerous justifications on which Your Honors may affirm the judgment of the trial court. However, as the argument set forth and given the time constraints, I will focus my argument on the community caretaking, emergency, and good faith exceptions to the Fourth Amendment and then stand on my brief on the other arguments unless Your Honors have questions on those. Your Honors, the state's position in this case is that the sweep of defendant's residence to check for other injured people was justified by the emergency exception and the community caretaking exception to the Fourth Amendment. To the extent that this court finds that in this case, the officers exceeded the scope of the emergency or the caretaking function, the people argue that exclusion would be inappropriate as the officers' actions were objectively reasonable and done in good faith. Your Honors, the defendant's argument here really makes the community caretaking and emergency exceptions non-existent. As Justice Jorgensen pointed out, assuming all, and Justice Hudson, assuming all facts being the same, only that there's an injured person in the bathtub, although I don't see why it has to be limited to the bathtub. The injured person could be anywhere, but that the defendant's roommate is injured inside the residence. Under the defendant's argument, there would be no basis for these officers to check on this person except what it seems to be in two limited cases. And that's number one, if the defendant consents, and or number two, someone specifically tells the police that there is someone else in the house. And I don't believe that this argument adequately reflects the state of the law. The requirements for the community caretaking exception are satisfied here. As Justice Hudson noted, first for it to apply, the police must be engaged in a function other than investigation of a crime. And that's clearly satisfied here as they were responding for a report of a possibly suicidal individual. Second, that the search be reasonably necessary for the protection of the public. And that's clear that the police officer's entry and sweep of the defendant's house was only made for the purpose of ensuring that there was no one else injured inside. There was no pretext here for any other search, simply to check for other people who might be in need of aid. And therefore, the issue before the court is whether this entry and sweep was reasonable under the totality of the circumstances. And the facts here support that the search was reasonable, given that the defendant had not provided any clear answers as to what had transpired earlier that night regarding his suicidal text messages, the cuts on the defendant's arms, his disoriented, intoxicated state, the officer's brief sweep to check for other people or victims was reasonable. In his argument and in his reply, defense counsel pointed to five crucial facts that he argues make the community caretaking exception inapplicable. And I'll address each of those. First, that the defendant told the officers that they could not enter his house. And the people are not arguing there was consent, but the defendant's statements or lack of consent should have pretty much little to no impact on whether objectively, the officers check for other people inside was reasonable. Obviously, if he had consented, there would be no issue, but the lack of his consent to go in does not obviate the public safety concern. Second, the officers had already identified the defendant based on a photo that they had received. And here it's somewhat nuanced, but the facts indicate that the officers had not identified the person in the photo with the knife in his lap. As we've been covered, the photo was indicated somebody wet, sitting in a bathtub. There's a very large knife in their lap with cuts on the arm. The defendant, 8am, the defendant wakes up, he's dry. The defendant also testified that the defendant did not admit that it was him in the photo. And during the entire interaction, he was unclear and disoriented. Thus, while the officers may have known that the person they were talking to was the person that they were to check on, they hadn't identified who was in that photo at the time they entered the house. Third, the defendant had cut marks on his arm. The cut marks actually support the inference that other people could be injured, as the defendant had not explained what happened or how he got the cuts. The possibility of other injured people inside the residence increased with this observation and justified a brief sweep. Fourth, that there was no indication to believe anyone else was in the house. Defendant, the defense counsel indicated that the girlfriend had not indicated there was anyone else. What this also supports a brief check, just because his girlfriend hadn't expressly identified or said who else was in the house, merely because she didn't do that or identify everyone, doesn't make the officer's belief that someone else could be in there unreasonable. And in fact, the defendant did have somebody else who was inside the house, his roommate. The trial court noted the possibility of a child in the residence, perhaps the defendant was watching his roommate's child. The bottom line is that the officers didn't know, and therefore it was reasonable to go in and check. Finally, defendant argues that he told the officers that no one else was in the home. And again, defendant statements should be given little to no weight as the police are not obligated to take his word for it, as defendants lie often. And this defendant was in fact lying, as there was somebody else in the residence. To defendant's point about where the defense counsel's point about that they should have known that there was no bathtub in the basement, that they were familiar with the house. I believe that the officer should be able to check anywhere in that residence where they reasonably believe a person could be. And they went into the basement, they saw a light on, therefore it was reasonable to check in that basement room where a light was coming from. Assuming this court finds that the police exceeded the scope of the emergency or caretaking functions, exclusion would be improper because they were clearly acting in good faith. Their actions were objectively reasonable and based on a good faith belief that their conduct was lawful. Defendant's counter argument that the police could not have been acting in good faith because the applicable law is well saddled and that no reasonably well-trained officer would have known that he couldn't go in the house is just simply wrong. Under Illinois law, police officers may conduct warrantless searches of a residence under certain circumstances, such as community caretaking or in emergencies. And the case is cited, people be hand and people be wood. Those were warrantless searches of residents which were upheld under community caretaking. Again, the reasonableness of the search depends on the circumstances and because each one involves different circumstances, it's impossible to prescribe a blanket rule to officers about when they can go in a house for emergencies or to perform their community line of cases, which is distinguishable because those cases are more capable of bright line rules about where a dog can or cannot sniff or the cases involving GPS devices placed on cars, whether that constitutes a search. Here, the officers were not acting with reckless disregard for established legal precedent and viewing the defendant's argument most favorably to him at best. The officers exceeded the scope of the emergency or caretaking function, but they were doing so in good faith to ensure public safety in this case. Additionally, your honor's exclusion is designed at deterring unlawful police conduct. Here, whether the court decides that the officer should have checked with the 911 caller who notably was not on scene or merely yelled into the house, which does not address the possibility of a injured, disabled person, or if there was a child, perhaps they have headphones on playing video games that none, neither of those affects the reasonableness of what the officer did here. But regardless, what the police officers did is not the sort of conduct that needs to be deterred. Here is, this is the sort of police conduct to be encouraged, checking on people who might be injured. They saw the plants in plain view on the floor in a basement room with the light on and then stopped and applied for a warrant. Once they obtained the warrant, the subsequent search was lawful and that officers were relying on it. The defendant said that the repeatedly, or I'm sorry, the defense counsel noted that the caretaking function must be strictly circumscribed by the exigencies justifying its initiation. And he says that the caretaking was done once the defendant was at the ambulance. And I would respectfully disagree. In this case, the caretaking required and the emergency, they don't know whether or not somebody else is injured inside, hurt, unable to speak or call out, simply locking up the house and going on their way would be a dereliction of their duty. So therefore the caretaking certainly requires a brief check to make sure there were no additional victims. For the reasons I've stated and in my brief, we would ask the court to find the community caretaking and emergency exception applicable and affirm the defendant's conviction and sentence. That completes my argument and I would be open to any questions. Justice Jorgensen, do you have any questions? You suggested that here we have a lack of consent to enter the house. Is that your position? Certainly he did not consent. So yes, he did more than not consent that he affirmatively said, you may not enter my house. Doesn't that change the dynamic here? I think that's one factor in the totality of the circumstances, him not wanting the police in there. But when you look at the rest of the circumstances that they hadn't addressed the knife situation, they hadn't identified who was there. He had not said whether it was him in the bathtub. They were getting nothing from him. So yes, he said, I don't go in my house. Excuse me, does he have an obligation to talk to the police? The defendant? No. So anything he refuses to say, you really can't hold that against him. You can hold what he did say against him. If they say, hey, who is this? In this photo, did you send this? And he's like, or he's unclear about what happened. I think that that's certainly... But he doesn't have to answer the questions, correct? He doesn't have to answer the questions. So failure to answer them can't be construed as extending this emergency, can it? Well, he did. Looking at what he did say, I mean, he said things. So based on what he did say, it goes to the officer's sort of, in this case, would be subjective opinion about what had happened inside the residence. The reasonableness of the police officer's conduct is an objective standard, not a subjective standard, correct? Yes. Okay. And you said the defendant's statements that he lied about someone else being in the house. You said defendants lie all the time. He's not a defendant. He's somebody that they're there to take care of. Right. I agree that he wasn't a defendant at the time, and certainly at the time, he was in no way a suspect. However, in the totality of the circumstances, police officers don't always have to take the word of the people that they're talking to. I think that in this case, the officers looked at the circumstances and decided that there was a possibility of identified that the person was in the, that he was the person in the bathtub. And so therefore, they decided under an objective reasonable standard, I think it was appropriate to go in and just check for people that nobody's lying bleeding on the floor. Okay. Now, a knife in a house. This is where the defendant here, he lives there, right? Yes. The house has a kitchen? Sure. Be reasonable to expect to find a couple knives in the house, correct? Yes. Okay. Your alternative theory is the emergency aid theory, which is separate from community care taking. Yes. Okay. Where is the emergency requiring immediate and necessary action? I believe that the emergency is ongoing. It's a 911 call at 8am. And they've identified an individual that they've identified because Kolesnikov, he's outside and within five to 10 minutes of speaking with him, they are concerned that there could be somebody else inside. They just don't know. And based on what they've seen and what they've heard, they're the officers form the opinion that there certainly could be somebody inside the residence that's in need of aid or injured. And so a brief, you know, what is an emergency is again, subject to the totality of the circumstances. But in this case, they've determined and that there had been injuries, there had been physical, that somebody had been injured. And so I believe until they know one way or the other, the emergency is ongoing. They don't know specifically that somebody is inside. But they don't know they don't have they haven't identified that everyone who was the investigation wasn't complete. As soon as they had more information, the emergency continued within it was five to 10 minutes by the time the defendant was at the ambulance requires a specific articulable emergency, as opposed to caretaking, which is a little bit more could have been should specific emergency, X person is in that house and is injured. Or with the issue with like a child in the house unattended. That's an immediate emergency that can be identified here. What's the emergency that was identified not possibly but was identified. In this case, they hadn't, they can't know specifically, but just because they don't know what happened doesn't mean that there isn't an emergency. They have a 911. My point is, these are two different theories. And in this theory, there is a specific emergency for which the police are acting to address your arguments thus this morning have been maybe there was someone in the house, maybe there was someone Yes, my argument is, is that I that the place to be searched is sorry, one moment that the the place to be searched is associated with the emergency. The officers knew that the the suicide the suicide attempt had come from this house. Therefore, I would argue that the inside of the entire house is subject to the ongoing emergency until they have that information that the person who they were there to talk about with a suicide was already in an ambulance at that time. Yes, they knew the questions. Thank you. Justice Hudson, do you have any questions? Yes. Council for the appellant has relied heavily on the case. Can you distinguish that case from the facts of this case? Sure. Um, in the officers went when the purpose of the caretaking in was to assist the ex girlfriend in obtaining her belongings from inside the house. The police did that they separated the parties, I believe it was in a common area. And the purpose, the court said that the purpose was the caretaking was to assist her in getting her belongings safely. They went the search exceeded the scope of that purpose because the officer went into the bedroom with the woman. They had one officer standing with with Mr. McRae. And the other officer went into the defendant's bedroom and the search of the defendant's bedroom. The officer was looking into a closet in a place where he there was no need she could gather her own belongings. It was clear that the officer exceeded what he was there to do. In this case, we don't have that. In here. The scope of the emergency or the scope of the caretaking function is that there's some of it evolved into there could be other people inside the residents in need of aid. Like your honor pointed out, they didn't look in drawers, they didn't go in. I don't in it from the officer's reaction. They didn't even want to call. But they went in the house, they only looked in places for bodies, or where somebody could be in a basement in a room with a light on that's a reasonable place to look. They didn't exceed the scope of what the caretaking function was here as the officer did in Micra. He looked inside a closet and he had no had no need to look anywhere in the group. I thank you. That's all I have at this time. Um, I've got a couple, I'm just having trouble phrasing them so that they don't sound repetitive, because I don't believe they are. If you what would be the purpose? There's some cases cited by both of you in your briefs, that moving this along once you're involved in this community caretaking, moving it along resolving the issues that are before you, especially since we're not contemplating criminal activity at that point is important. So why would it make sense for them to, you know, put him in the ambulance and then one of them go to the left side of the house, the other go to the right side of the house and ask some questions about, you know, who lived there? What are they like? What would be the purpose of that within the concept of why they were there in the first place? Um, are you asking me why should to the left side of the house to the right side of the house to speak with neighbors? Yeah, go to talk to the neighbors. Council said that they had lots of opportunities to make the inquiries they were concerned about by just talking to the neighbors. What mandated that they must go talk to the neighbors under these circumstances? I don't believe they had to go talk to the neighbors. Um, I, I, I don't also believe that they don't, they didn't have to call back to the council also argued that they could have called back the ex-girlfriend. Uh, she wasn't on scene. This is 8 a.m. and they don't have a lot of information as to what had gone on in that house. They're concerned that there's somebody injured. Uh, Justice Jorgensen disagreed with the emergency part of that, but I would argue that regardless whether there was an emergency or whether, uh, they were going in to make sure nobody was injured under community caretaking. I don't think that before they do that, one of the requirements is that they go over and check with all the neighbors about who lives there. Um, it's again, under the totality of the circumstances was what they did reasonable. Sure. They could have done two other things or something else. They could have yelled into the house. They could have knocked on neighbor's doors, but it's 8 a.m. and they believed, uh, somebody was inside injured, uh, or could have been. Um, so I, I don't, I don't believe they have to, uh, go to the neighbors. If there are two sets of stairways at or near that kitchen location and one goes down and one goes up, is there any reason why, I mean, any, um, I don't go up first and then go down later, or, I mean, what, um, Mr. Walker seems to make a significant point that they went to the basement first. What, what, what, where does that come from? What does that, why is that so significant? I, I don't believe that it is significant. They, they were, I, my recollection is that there were two officers. One went downstairs, one went upstairs. Uh, one stayed in the kitchen. I think there were three officers. One went downstairs, one went upstairs and one was in the kitchen. Uh, and they remet in the kitchen. Uh, I, the search, uh, the scope of the search and, and the, uh, has to be limited to the, uh, the, the, I'm sorry, the purpose or the scope of the search, where they search anywhere that there could have been a person. Uh, counsel argued that it had to be the bathtub, that there would be no bathtub in the basement just because the photo involved a person in the bathtub and counsel alluded to this defendant was drunk, hung over, possibly had no idea what happened that previous night. Therefore, anything could have happened in that house. Uh, and they weren't able to figure that out from the text or from speaking to the defendant. So going downstairs where somebody could be, maybe there was a fight, maybe there was a, yes, there's a lot of maybes, but it's reasonable for the officers to assume that there could be a person injured downstairs, could be a person injured upstairs. Uh, there could be a child that if they had, as your honor pointed out, that they would have to lock up, uh, the house before they left the scene, uh, for both protection of the defendants, as well as, uh, public policy to make sure nobody stole anything, but they can go downstairs. They can go upstairs as long as they're not looking through items anywhere that there could be a person found. I believe that the going downstairs first, which I don't believe is accurate, uh, is, is in a positive. All right. Thank you, counsel. I don't have any additional questions. Uh, Mr. Walker, if you wish to, uh, present a reply, this would be the time. Uh, yes, please. Just very briefly. Thank you. First, I would like to outline that unfortunately, I believe counsel misstates the facts in this case, uh, particularly that officers were individually searching throughout the house. Uh, the record indicates that the commanding officer and officer Berryhill went down into the basement together while officer Foy remained in the kitchen. It was only after they got done with their search of the basement that they decided to go upstairs. Um, I would also address counsel's argument that, uh, the police's mere bald concern without some form of objective evidence to back it up would give them, would open up, uh, the possibility of police acting in furtherance just based on mere suspicion, which would completely undermine the fourth amendment warrant requirement. What we're talking about here is allowing officers, uh, who are addressing certain community caretaking functions to act based on mere suspicion. Uh, for instance, if somebody's car is parked illegally, uh, and they need the car out of the way, does that give them a basis for searching that individual's trunk? I think that would just be absurd. Um, and the state also points to no objective facts that would indicate that there was an ongoing need for somebody to receive assistance. Again, uh, I would concede that if the officers spoke to a neighbor or spoke to Kolesnikov's ex-girlfriend or through some other means, searching a database or what have you, discovered that there may have been someone else in the home, then that may have given them a basis based on Kolesnikov's, uh, inability to identify himself as the man in the tub to go into the home. But at the time they went there, the only information they had was that Kolesnikov had threatened to commit suicide. All the information that they had at that time revolved around Kolesnikov and all the circumstantial evidence indicate that Kolesnikov was the only individual who needed assistance. Uh, and as, let's see, well actually, it's pretty simple in this case because the officers have a duty to follow and enforce the law. And here, the law is that without a warrant, and unless there's an exception to that requirement, you cannot just enter somebody's that the Fourth Amendment was designed to guard against. And that would be all I have. Justice Jorgensen, did anyone check on or was there any confirmation of the veracity of the person that made the 911 call? Uh, I don't believe so. It's not in the record, unfortunately. All right, fair enough. Then I have nothing else. And Justice Hudson. Yes, I do have a final question. Mr. Walker, when the police arrived at the residence and they met with Mr. K, were they able to tell at that point that his face was the face of the person who was in the tub with the knife? Unfortunately, Your Honor, the picture did not show anybody's face, uh, the tub picture. So it was not definitive at that point that Mr. K was the person who was sitting in a tub with a large knife, correct? Yes, that would be correct. Okay, that's all I have. Uh, Mr. Walker, I think, and I was trying to find the page in the brief and I can't, so I apologize. But I believe you mentioned an abstract concern is not sufficient to proceed with this search or with this, um, overview of the house. What does that mean? It means that the officers have to have some reasonable suspicion, not just a blanket suspicion. They can't come up with hypotheticals in their head in order to justify warrantlessly entering somebody's house. Uh, my argument was principally focused on the fact that there were other means by which they could have formed a basis to search the house. Again, they could have, uh, reached out to dispatch to confirm whether Coleson Coff was the only resident. They could have spoken to neighbors. Um, there were ways that they could have obtained an objective basis for believing that someone else might have needed their assistance. Okay, when they finish their conversation and, uh, remove or tell the ambulance, which is staging down the street to come forward, um, I'm, well, I'm not going to assume anything. They take him to the ambulance and they see some marks, but they do not see a knife. And, pretty obvious, he's not dead. So why wouldn't looking for someone who might be otherwise injured, and more particularly looking for the knife, be not an abstract concern, but an issue that needed to, issues that needed to be resolved in order to ultimately close this, uh, community caretaking investigation? Your honors, I believe that, that, that toes a very dangerous line. Uh, if an individual is threatening to commit suicide or to do something within their home to themselves, maybe they're talking about, um, I don't know, self castration or something to that effect. To allow police to search throughout an individual's home and seize all of any sharp objects within their home without a warrant, uh, would be patently absurd. These individuals have a right to possess their personal property unless, uh, they've received due process and an independent magistrate has determined that, um, they're a danger to themselves or something like that. In this case, the police had secured Mr. Kolesnikoff in the ambulance. At that point, they could have applied for a search warrant in order to get this evidence. There was no immediate danger. There was no immediate necessity. In fact, the officers could have stood going to the point of securing his home. They could have, uh, obtained some kind of warrant or staged an officer at the door, uh, in order to properly go about entering this man's home. Instead, they decided to take an impermissible shortcut, which is unfortunate. I'm not saying that the officers may not have had, uh, it's hard, it's hard for me to articulate this, but there were proper ways of going about this, which while, um, not as time efficient, I guess, would have been, would have coincided with the law, if that makes sense. Okay. I'm the, uh, I'm the magistrate that, uh, the commander or somebody's going to go to, to, uh, get the search warrant, uh, to get in the house. And I say, uh, I did a community caretaking. The party, the party, I think, who is the subject of the email has presented himself. Uh, we found some cuts on his arm, but we did see in a picture, a really big knife that we have not now found. Uh, we need to go and secure that knife. And the magistrate, oh, and I say, that's right, it's me. So why do you need it? Well, I want to close the investigation, make sure this is the only knife and make sure that there are no other persons, um, in the, the residents that might have been injured or some way implicated in the cuts on the man's arms. Um, are, are you going to, you know, do you think the magistrate's going to give you a search warrant on that basis? Because now the house has been left. If you point to some facts, for instance, in applying for the warrant, the concern could have been, um, I believe there would have been a basis if the officer indicated that someone else may have been injured inside the home because the individual who received the emergency aid didn't identify another possible victim. I mean, in that case, yes, I believe the magistrate could issue a warrant. But, you know, but there's delay in doing that. Why delay the process for that? Why don't we just look for it? And if it's there, it's there. If it's not, it's not. Because Mr. Kolesnikov has a right to privacy absent, uh, some exception to the fourth amendment warrant requirement. Uh, his home is his castle. The police are not entitled to search just based on, um, abstract hypotheticals. All right. Um, Justice Jurgensen or Justice Hudson, any other questions of Mr. Walker? I do not. No, thank you. Okay. All right. Well, gentlemen, we have completed this particular, uh, uh, argument this morning. Thank you very much for participating and thank you for your interesting arguments. We will take the matter under advisement. Uh, we are standing in, uh, adjournment at this point and, uh, my colleagues, uh, office or cell phones, cell phones in 10 minutes. Okay. Justice Hudson. Do we need to do it in 10 minutes? Could we do it a little bit later this morning? Unless you want to call me, we'll talk about it. Office. I'll call office and talk about it, but right. We'll stand at 10 unless otherwise identified. Right. Okay. Thank you. Thanks. Bye-bye.